IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN O. HAFEN, in his capacity as Court-Appointed Receiver,<br><br>Plaintiff,<br><br>v.<br><br>GRETCHEN A. HOWELL, an individual; and LESLIE M. HOWELL, an individual,<br><br>Defendants. | **ORDER AND MEMORANDUM DECISION ON ECF NOS. 37, 52 AND 54**<br><br><br>Case No. 2:19-cv-00813-TC-DAO<br><br>Judge Tena Campbell<br>Magistrate Judge Daphne A. Oberg |

There are three pending motions before the court.  First, Defendants Gretchen A. Howell (Gretchen) and Leslie M. Howell's (Les; together, the Howells) Motion to Exclude Proposed Expert Jonathan O. Hafen (Mot. Exclude Hafen).  ECF No. 52.  Second, the Howells' Motion to Exclude Proposed Expert D. Ray Strong (Mot. Exclude Strong).  ECF No. 54.  Third, the Receiver's Motion for Summary Judgment (Mot. Summ. J.).  ECF No. 37.  The court denies the Howells' motions to exclude and grants the Receiver's Motion for Summary Judgment.

## I.    Factual and Procedural Background

This is an ancillary action to <u>Commodity Futures Trading Comm'n et al. v. Rust Rare Coin et al.</u>, No. 2:18-cv-00892-TC-DBP (the "Enforcement Action").[1]  The Commodity Futures Trading Commission (CFTC) and the Utah Division of Securities (UDOS) initiated a civil enforcement action against Rust Rare Coin, Inc. (RRC), Gaylen Dean Rust, and related individuals and entities (collectively, the "Receivership Defendants"), on November 13, 2018.

---

[1] In this Order, the record in Case No. 2:18-cv-00892-TC-DBP is cited as "Enforcement Action, ECF No. [x]."  Otherwise, ECF-numbered citations in this Order are citations to the record in the current action, Case No. 2:19-cv-00813-TC-DAO.

Enforcement Action, ECF No. 1.  The CFTC and UDOS alleged the Receivership Defendants had offered an investment opportunity (the Silver Pool), through which the Receivership Defendants claimed to generate substantial returns for investors by buying and selling physical silver.  Id.  The CFTC and UDOS also alleged the Silver Pool was a Ponzi scheme, rather than a legitimate investment.

As part of the Enforcement Action, the court appointed Jonathan O. Hafen (the Receiver) as Temporary Receiver for the assets of Receivership Defendants.  Enforcement Action, ECF No. 22.  On November 27, 2018, the court entered an Order that, among other things, continued the Receiver's appointment until further order of the court.  Enforcement Action, ECF No. 54.  The Receiver was charged with several tasks, including investigating the financial and business affairs of Receivership Defendants and recovering all assets of the Receivership estate.  Id.

On October 24, 2019, the Receiver began the above-captioned ancillary action, seeking to recover funds transferred to the Howells by Receivership Defendants.  Case No. 2:19-cv-00813-TC-DAO, ECF No. 2.  On November 30, 2021, he filed the pending Motion for Summary Judgment.  The Receiver requests the court make four determinations, discussed below, and seeks disgorgement back to the Receivership estate of all amounts received by Gretchen Howell and Leslie Howell in excess of their principal investments in RRC.  The Receiver submitted reports from Mr. Hafen and D. Ray Strong in support of the Motion, and a Declaration from Jeffrey T. Shaw.  App. Mot. Summ. J. Ex. C ("Shaw Decl."), ECF No. 39-1.  The Howells oppose the Motion for Summary Judgment and move to exclude each expert.  See, e.g., Mot. Exclude Proposed Expert Jeffrey T. Shaw (Mot. Exclude Shaw), ECF No. 53.[2]  The court has

---

[2] The Receiver opposed the motion. Opp. Mot. Exclude Shaw, ECF No. 73.  The Howells replied in support of excluding Mr. Shaw.  Reply Supp. Mot. Exclude Shaw, ECF No. 74.

already denied the motion to exclude Mr. Shaw.  Order, ECF No. 75.[3]  The motions to exclude

Mr. Hafen and Mr. Strong, and the Receiver's Motion for Summary Judgment, remain pending.

## II.    The Court Denies the Motion to Exclude Proposed Expert Jonathan Hafen.[4]

The court first turns to the Howells' Motion to Exclude Proposed Expert Jonathan O.

Hafen.  Mr. Hafen's report was submitted in support of the Receiver's Motion for Summary

Judgment.  App. Mot. Summ. J. Ex. A (Hafen Report), ECF No. 38-1.  The Howells contend the

Hafen Report is inadmissible and the court should not consider it at trial or for any other purpose,

including in deciding the Receiver's Motion for Summary Judgment.[5]  Specifically, they assert

the Hafen Report and Mr. Hafen's testimony should be excluded under Fed. R. Evid. 702.[6]  They

say this is so because Mr. Hafen does not qualify as an expert on "'Ponzi schemes,' if such thing

exists," and because his testimony is improper and inadmissible.  Id. at 2–6.  However, the court

disagrees with the Howells' assessment of the admissibility of Mr. Hafen's opinions.  It admits

Mr. Hafen's testimony, and for the purposes of summary judgment, the Hafen Report.

a)  A Ponzi Scheme Expert Can Exist Under the Federal Rules of Evidence.

Expert testimony may be admitted on any topic that "will help the trier of fact to

understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Reflecting this,

---

[3] The court has also denied the Howells' motions for summary judgment.  Order, ECF No. 78.
[4] In describing what Mr. Hafen and Mr. Strong say in their Reports for the purpose of deciding the motions to exclude, the court does not comment on whether their conclusions are correct.
[5] The Howells make these points in their Opposition to the Receiver's Motion for Summary Judgment, ECF No. 47 at 6–7, 19–21, and in their Motion to Exclude Mr. Hafen (ECF No. 52). The Receiver responded.  Opp. Mot. Exclude Hafen, ECF No. 83.  The Howells' attorney replied orally during the hearing held on December 15, 2022.  See Order Lifting Stay, ECF No. 80.
[6] The Howells oppose Mr. Hafen serving as a fact or as an expert witness.  Opp. to Mot. Summ. J. 19; Mot. Exclude Hafen 2.  Although the Receiver makes a brief argument that Mr. Hafen is "entitled to offer evidence as a lay fact witness," the Receiver largely treats him as an expert witness.  See Opp. Mot. Exclude Hafen 2, 6 (depicting Mr. Hafen's testimony as that of an expert but noting he is entitled to offer evidence as a fact witness).  Accordingly, the court evaluates the admissibility of his testimony as an expert witness for the purposes of this Order.

and that "Ponzi schemes" can be such a topic, many courts have admitted expert testimony to help jurors assess whether an investment scheme was a Ponzi scheme, reasoning such testimony can be relevant and helpful to the trier of fact on this issue.  See, e.g., In re Twin Peaks Fin. Servs., Inc., No. ADV 11-08006, 2012 WL 3309715, at *2 (Bankr. D. Utah Aug. 13, 2012) (relying on expert report in making Ponzi scheme determination at summary judgment); Wiand v. Waxenberg, 611 F. Supp. 2d 1299, 1318 (M.D. Fla. 2009) (considering, at summary judgment, expert testimony opining on whether investment activities were a Ponzi scheme); In re Bonham, 251 B.R. 113, 132 (Bankr. D. Alaska 2000) (qualifying trustee as expert in Ponzi scheme case); Zazzali v. Eide Bailly LLP, Case No. 12-CV-349, 2015 U.S. Dist. LEXIS 199840, at *5 (D. Idaho Mar. 3, 2015) ("an expert may opine on . . . the existence of a Ponzi scheme.").

b) Mr. Hafen is Qualified as a Ponzi Scheme Expert.

It is for the court, as gatekeeper, to decide if an expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion."  Roe v. FCA US LLC, 42 F.4th 1175, 1180 (10th Cir. 2022) (quoting Fed. R. Evid. 702).  "The fields of knowledge which may be drawn upon are not limited merely to the scientific and technical but extend to all specialized knowledge."  City of Hobbs v. Hartford Fire Ins. Co., 162 F.3d 576, 586 (10th Cir. 1998) (quoting Fed. R. Evid. 702 advisory comm. note (1972)).  The Receiver's attorneys represent that Mr. Hafen's expertise in Ponzi schemes was developed over more than a decade of representing such individuals in federal court.  See Hafen Report App. A, ECF 38-1 at 37–40 (describing Mr. Hafen's expertise and stating "Over the course of his career, Mr. Hafen has recovered tens of millions of dollars on behalf of investment fraud victims."); Opp. Mot. Exclude Hafen 3 (observing that Mr. Hafen's experience includes representing a class of hundreds of elderly individuals defrauded through Ponzi schemes in Bryant v. Mann, 2:98-cv-00784 (D.

Utah)).  Mr. Hafen has specialized knowledge of the mechanics of Ponzi schemes from his lengthy representation of individuals who have been defrauded by Ponzi schemes.  While the Howells' argument that Mr. Hafen is not at this time an expert in receiverships might have merit, his opinion is not being offered on that subject.  Mr. Hafen is qualified to offer expert testimony on the subject of Ponzi schemes.

     c)  <u>Mr. Hafen is Properly Offering an Expert Opinion.</u>

Rule 702 reads: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  <u>Hobbs</u>, 162 F.3d at 586 (quoting Fed. R. Evid. 702).  The "expert's testimony must assist the trier of fact."  <u>Id.</u>  But it cannot supplant the court's duty to define the law or invade the jury's role in applying the law to the evidence.  <u>See</u> <u>Specht v. Jensen</u>, 853 F.2d 805, 807–10 (10th Cir. 1988).  An expert witness, even an attorney expert witness, may however "properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."  <u>Id.</u>; <u>see</u> <u>Zazzali</u>, 2015 U.S. Dist. LEXIS 199840, at *11 ("a qualified expert may testify to either the existence of a Ponzi scheme or the characteristics of a Ponzi scheme and a jury may decide the existence of Ponzi scheme without offering a legal conclusion or invading the province of the Court.").  Mr. Hafen's opinion is offered for this permissible function, on a subject with which many lay jurors are unlikely to have much experience: sophisticated Ponzi schemes.  He may not reach the legal conclusion of whether the circumstances of the RRC scheme amount to an illegal Ponzi scheme because it is for the jury to decide whether the circumstances of the RRC scheme amount to an illegal Ponzi scheme, but Mr. Hafen's expert opinion is properly offered on the mechanics of Ponzi schemes.

d)  <u>For the Purposes of Summary Judgment, The Court Admits the Hafen Report.</u>

"At the summary judgment stage, a party may support its factual assertions by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[.]'"  <u>Navajo Nation Hum. Rts. Comm'n v. San Juan Cnty.</u>, 281 F. Supp. 3d 1136, 1161 (D. Utah 2017) (quoting Fed. R. Civ. P. 56(c)(1)).  At this stage, "evidence need not be submitted 'in a form that would be admissible at trial.'"  <u>Argo v. Blue Cross & Blue Shield of Kansas, Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)).  Parties may

> submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.  Nonetheless, the content or substance of the evidence must be admissible.  Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements <u>contained</u> in affidavits, as those statements could not be presented at trial in any form.

<u>Navajo Nation Hum. Rts. Comm'n</u>, 281 F. Supp. 3d at 1161–62 (citing <u>Argo</u>, 452 F.3d at 1199) (emphasis in original, internal citations and quotations omitted).  Based on this framework and Rule 56(c) itself, courts in this district have concluded that expert reports are admissible for purposes of summary judgment, reasoning that even though the <u>reports</u> would likely be inadmissible at trial as hearsay, "the <u>substance</u> of the reports would plainly be admissible at trial in the form of expert testimony regarding methodology, opinions, and ultimate conclusions."  <u>Id.</u> at 1162.  This is the case even for expert reports that "contain flatly inadmissible hearsay statements, [because] experts are often entitled to rely on otherwise inadmissible evidence to explain and support their ultimate opinions and conclusions."  <u>Id.</u> (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592 (1993)).  The substance of the Hafen Report may be presented at trial in an admissible form through Mr. Hafen's testimony.  As a result, the court will consider

the Hafen Report on summary judgment.[7]  But the court will consider statements in the Report

that would not otherwise be admissible at trial as hearsay "only insofar as they support or

otherwise explain the reasoning and ultimate conclusions of the expert."  Id. (citing Daubert, 509

U.S. at 592).

### III.    The Court Denies the Motion to Exclude Proposed Expert D. Ray Strong.

The court next turns to the Howells' Motion to Exclude Proposed Expert D. Ray Strong.

Mr. Strong's report was submitted in support of the Receiver's Motion for Summary Judgment.

App. Mot. Summ. J. Ex. B (Strong Report), ECF No. 38-2.  Mr. Strong's declaration was

included as Exhibit A to the Hafen Report.  Hafen Report 42–125 (Declaration of D. Ray Strong)

(Strong Decl.), ECF No. 38-1 Ex. A.  The Howells argue Mr. Strong's opinions are not

admissible because he relied on incomplete and unreliable information, and his opinions are

unhelpful and invade the province of the judge and jury.  Consequently, the Howells contend, the

court should not consider Mr. Strong's opinions at trial or for any other purpose.[8]  However, the

Howells' have not adequately supported these points.  The court denies the motion to exclude

Mr. Strong.

a)  Mr. Strong Relied Upon Sufficient Information to Satisfy Rule 702's Requirements.

Expert testimony must be reliable, meaning it is "based on sufficient facts or data."  Fed.

R. Evid. 702(b).  Mr. Strong did not rely on fully comprehensive information, meaning he did

not examine the universe of information about the subjects on which he opines.  But this does not

---

[7] Having admitted the Hafen Report—at least at the summary judgment stage—the court does
not now assess whether it is independently admissible under Federal Rule of Evidence 1006.

[8] The Howells make these points in their Opposition to the Receiver's Motion for Summary
Judgment, see Opp. Mot. Summ. J. 6–7, 19–21, and in their Motion to Exclude Mr. Strong, Mot.
Exclude Strong.  The Receiver responded in opposition.  Opp. Mot. Exclude Strong, ECF No. 84.
The Howells' attorney replied at the hearing on December 15, 2022.  See Order Lifting Stay.

mean his testimony fails to meet Rule 702's standard.  See Blocker v. ConocoPhillips Co., No. CIV-17-248, 2019 WL 13153247, at *3 (W.D. Okla. May 13, 2019) (quoting United States v. Crabbe, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008)) ("the assessment of the sufficiency of facts and data used by an expert witness is a quantitative, rather than a qualitative, analysis. . . . [T]he proper inquiry 'examines only whether the witness obtained the amount of data that the methodology itself demands.'").  Mr. Strong's team performed extensive analyses of voluminous documentation, information, and data.  See Strong Report 10–12.  He and his team analyzed bank records, interviews, corporate records, email archives, and third-party documentation from parties including financial institutions, investors, precious metal dealers, vendors, and customers. Id.[9]  The court finds Mr. Strong based his opinion on quantitatively sufficient facts and data for the purposes of the development of his opinion under Rule 702.

    b)  Mr. Strong's Opinions are Permissibly Helpful.

An "expert's testimony must assist the trier of fact."  Hobbs, 162 F.3d at 586.  Mr. Strong had to undertake complex data analyses in order to understand the workings of the RRC scheme; his testimony is helpful—permissibly helpful, under the Federal Rules of Civil Procedure—in assisting the trier of fact understand RRC's complex business activities and records.

    c)  Mr. Strong's Opinions Do Not Invade the Province of The Judge or Jury.

The Howells argue Mr. Strong impermissibly opines on the weight of the facts, and steps into the jury's role, with his statements on pages 76–77 of the Strong Report.  Mot. Exclude Strong 4.  These pages include Mr. Strong's "Summary of Conclusions."  Here, he observes RRC

---

[9] Mr. Strong's report establishes his qualifications as an expert.  Strong Report 85–94 (Ex. 1, Curriculum Vitae of D. Ray Strong).  The Howells do not appear to challenge his qualifications. See Mot. Exclude Strong.  The court finds that Mr. Strong is qualified as an expert in the subjects on which he opines.  See Norris v. Baxter Healthcare Corp., 397 F.3d 878, 884 (10th Cir. 2005) (noting district court assessed expert qualifications as part of reliability analysis).

operated as a Ponzi scheme and exhibited common characteristics of Ponzi schemes, and that the recovery process had, at that time, tallied over $100 million in claims.  Strong Report 76–77.  In particular, the Howells object to Mr. Strong's opinion "that RRC was not a viable enterprise and operated as a Ponzi scheme."  Mot. Exclude Strong 4 (quoting Strong Report 76).

The objected-to language is drawn from the following sentence: "When the results of the financial activities are analyzed and scrutinized, it becomes apparent, from a business perspective, that RRC was not a viable enterprise and operated as a Ponzi scheme beginning from at least TY2008."  Strong Report 76.  While Mr. Strong can, without invading the province of the jury, opine about RRC's solvency and viability and about whether his analyses reveal that RRC showed common indicators of Ponzi schemes, his opinion that RRC was a Ponzi scheme goes too far.  Accordingly, as with the Hafen Report, the court will consider the Strong Report and the Strong Declaration on summary judgment, but it excludes his opinion on the ultimate issue of whether RRC was actually a Ponzi scheme.

## IV.    The Court Grants the Receiver's Motion for Summary Judgment.

The court next turns to the Receiver's Motion for Summary Judgment.  ECF No. 37. Having considered the parties' arguments, and based on the undisputed material facts, the court finds that the Receiver is entitled to summary judgment, as set forth below.

a)  <u>Statement of Undisputed Material Facts</u>.

In opposing the Receiver's Motion for Summary Judgment, the Howells argue that the Hafen Report, Strong Report, and Shaw Declaration are not admissible because these expert witnesses do not have personal knowledge of the events, circumstances, or facts, and they rely on hearsay.  Opp. Mot. Summ. J. 6–11 (objecting to the Receiver's reliance on facts from these sources in responding to the Receiver's statement of undisputed facts).  The Howells argue that

because of the inadmissibility of these materials, the Howells are not required to come forward with evidence to demonstrate the existence of a genuine dispute of a material fact in order for the court to disregard these facts on summary judgment.  Id. at 6–7.  Put differently, the Howells' argument is that because the Receiver has failed to introduce admissible evidence to support the facts asserted by the Receiver's experts, the Howells similarly do not have to introduce evidence to rebut these facts at the summary judgment stage. But as discussed in this Order, the court has generally found the Howells' objections to the admissibility of the Receiver's experts' reports and declarations unavailing.  Consequently, the Howells' objections about the admissibility of the Receiver's expert materials are not genuine disputes about material facts.  Except where the Howells point to a genuine dispute of a material fact, the court treats the facts in the Hafen Report, the Strong Declaration, the Strong Report, and the Shaw Declaration as undisputed and relies on them when the facts are material.

        i.   Receivership Defendants' Silver Pool Scheme.

        The Receivership Defendants solicited funds from investors by representing that they would use such funds to trade physical silver which would generate returns for investors.  Hafen Report 12–13; Strong Decl. ¶ 98.  Specifically, the Receivership Defendants represented that one-half of invested funds would be used to purchase physical silver, which would be stored at Brink's facilities.  According to the Receivership Defendants' representations, the remaining one-half of the invested funds would be used to buy and sell physical silver on the commodities market, thereby increasing the investor's silver holdings over time and generating returns on the

investment.  Hafen Report 12; Strong Decl. ¶¶ 20, 98; App. Mot. Summ. J. App. Ex. E, ECF No. 39-3, Deposition of Les Howell (Les Dep.) 22:12–23:8.[10]

In reality, investor funds were not used to purchase physical silver.  Hafen Report 13–14; Strong Decl. ¶ 22.  Mr. Rust admitted that new investor funds were used to pay returns to existing investors and to fund other businesses that were unrelated to the Silver Pool.  Strong Report 13–15.[11]  Although Receivership Defendants represented that they managed over $80 million of physical silver and that approximately one-half of that amount was stored at Brink's locations in Salt Lake City and Los Angeles, there is no evidence that Receivership Defendants ever stored significant amounts of physical silver at Brink's or any other facility. Strong Report 9–10, 48.  Mr. Rust admitted that there was no significant amount of silver stored at Brink's at the time of the Receiver's appointment.  Hafen Report 13; Strong Decl. ¶ 99.  There is no evidence that Receivership Defendants ever traded significant amounts of physical silver on a regular basis in the manner represented to investors. Hafen Report 13; Strong Decl., ¶ 99.

Since 2008, the Receivership Defendants raised at least $225 million from investors and paid out at least $175 million to investors.  Strong Report 6–7.  Even as early as 2008, the net operating income obtained through Receivership Defendants' limited business operations was insufficient to make payments to investors.  Id. at 6, 23–24.[12]  The payments made to investors

---

[10] The Howells dispute this fact as inconsistent with the cited deposition testimony of Les.  Les' cited deposition testimony is not inconsistent with these facts in a material way.

[11] The Howells specifically object to the admissibility of statements from Mr. Rust.  But as discussed above, the court will consider Mr. Rust's statements, contained in the Receiver's expert reports and declarations, "insofar as they support or otherwise explain the reasoning and ultimate conclusions of the expert."  Navajo Nation Hum. Rts. Comm'n, 281 F. Supp. 3d at 1161–62 (citing Daubert, 509 U.S. at 592).

[12] Specifically, the total net operating income of RRC—Rust's only profit-generating business— in TY2008 was at best $259,154.  During TY2008, the Receivership Defendants took in at least $3.2 million in payments from investors.  During TY2008, the Receivership Defendants made payments to investors in excess of $1.6 million.  During TY2008, the Receivership Defendants

since 2008 could only have been sourced from funds raised from other investors, as there was no other source of funds from which these payments could have been made.  Strong Report 76.

From 2008 through the appointment of the Receiver in 2018, Receivership Defendants continued to take in ever-increasing funds from investors and to pay out exorbitant returns. Between January 1, 2018, and November 15, 2018, the Receivership Defendants paid more than $37 million to investors.  Strong Report 278 (Summary of Bank Account Activity for Rust Rare Coin, Inc. – Summarized by Year (January 1, 2012 through November 15, 2018), Ex. 25 to Strong Report, EX194).  The Receivership Defendants represented that the Silver Pool was "risk free," "no risk," or "virtually risk free" because the investment was backed by physical silver, which would always have value.  Hafen Report 6; Strong Decl. ¶ 125.  The Receivership Defendants guaranteed "no loss of principle [sic]" invested.  Strong Report 183–209 (Schedule of Gaylen Rust Investor Representations Receiver's Report Dated September 20, 2020, Ex. 8 to Strong Report, EX104).  The Receivership Defendants represented that the Silver Pool paid an average return of 20-25%.  Strong Report 44.  The Receivership Defendants represented that returns between 2012 and 2017 exceeded 40%.  Id. at 319–20 (Declaration of Howard Hess, Ex. 35 to Strong Report, EX235–36).  The Receivership Defendants represented that the lowest return on the Silver Pool investment during a thirty-year period was 12%.  Strong Report 44. Investor statements provided by the Receivership Defendants reflected that every silver trade was profitable and that the Receivership Defendants had never lost money on a trade.  Id. at 7. The Receivership Defendants promoted the Silver Pool as an exclusive program offered only to

---

also made payments to other RRC-affiliated businesses in excess of $1.5 million.  From at least TY2008, the income generated from operations of the Receivership Defendants was grossly insufficient to finance the substantial payments promised to investors.  New funds contributed by investors provided the only funding source large enough to facilitate these payments.  Id. at 6, 23–24.

those investors Mr. Rust knew personally.  Id. at 58–59.  The Receivership Defendants falsely

claimed to have a trading relationship with HSBC, one of the world's largest banks, and to

employ a proprietary trading algorithm that allowed the Receivership Defendants to beat the

market.  Hafen Report 21; Strong Decl. ¶¶ 122, 129–30.  The Receivership Defendants paid

exorbitant returns to investors for years, creating the false impression that profits were being

earned and thereby attracting new investors to the scheme and convincing existing investors to

increase their investment.  Strong Report 7.

Investors have likely suffered in excess of $100 million in net principal losses.  Id. at 77.

    ii.   <u>Gretchen and Les Howell's Investments In, and Disbursements From, The</u>
<u>Silver Pool.</u>

Gretchen and Les Howell were married in 1999.  Howells' Mots. Summ. J. Ex. 1,

Declaration of Gretchen Howell (Gretchen Decl.) ¶ 3, ECF No. 43-1; Howells' Mots. Summ. J.,

Ex. 2 (Les Decl.) ¶ 5, ECF No. 43-2.  They came into the marriage with separate assets, and have

largely kept their finances separate, including maintaining separate bank accounts.  Gretchen

Decl. ¶¶ 4–6; Les Decl. ¶¶ 4–6.[13]

During their marriage, Les and Gretchen made "investments" in RRC; Les began

investing with RRC in 2008, and Gretchen began in 2009.  Les Decl. ¶ 7; Gretchen Decl. ¶ 7.

Gretchen invested $96,450.00 with RRC, and Les says he invested $1,222,003.77.  Gretchen

Decl. ¶ 7; Les Decl. ¶ 7.[14]  Gretchen agrees she received disbursements from RRC totaling

$22,000, meaning she paid $74,450.00 more to RRC than she received from it.  App. Mot.

---

[13] The Receiver objects that the facts in this paragraph, included by the Howells as Additional
Material Facts, are immaterial.  The Receiver has not objected to the veracity of these facts, and
they are not contradicted elsewhere in the record before the court.  The court considers them
undisputed for the purposes of this Order.
[14] For the purposes of summary judgment, the Receiver agrees that Les invested this amount.
Reply Supp. Mot. Summ. J. 7 n.2.

Summ. J. Ex. F, Deposition of Gretchen Howell (Gretchen Dep.) 24:17–22, ECF No. 39-4; Opp.

Mot. Summ. J. 12, ECF No. 47 (admitting these facts are undisputed).  Les agrees he received

disbursements from RRC totaling at least $4,511,000.00.  See Opp. Mot. Summ. J. 13 (stating

Les received payments from RRC totaling $4,522,830.85); App. Mot. Summ. J. Ex. D, ECF No.

39-2, Defendants Responses to Plaintiff's First Set of Discovery Requests (Def. Interrog. Resps.)

10, 26–28 (representing Les received disbursements totaling $4,511,000.00).

    Gretchen and Les hold title to a property in Kingman, Arizona.  Specifically, Les used

money he received from RRC to buy 92 acres of land in Kingman.  Les Dep. 12:23–13:1;

Gretchen Dep. 4:17–25.[15]  Les exclusively used money he received from RRC to build the house

on the Kingman property that he and Gretchen share.  Id. at 12:2–10.  Les confirmed it would

"probably be a good estimate" to say he paid his homebuilder between three and four million

dollars to build the home on the Kingman property.  Id.  The Howells moved into the house on

January 1, 2018.  Id. at 5:17–6:6; Gretchen Dep. 24:6–8.  The Howells hold title to their

Kingman property as joint tenants.  Opp. Mot. Summ. J. 14 (admitting this fact).

  b) Discussion

    The Receiver seeks four determinations.  First, that Gaylen Dean Rust, individually and

through Rust Rare Coin, Inc. operated a silver investment scheme (the Silver Pool) since at least

---

[15] The Howells' allege that these facts about the Kingman land and house, and how it was paid for, are in dispute.  The Howells are incorrect.  Les testified under oath at his deposition that the source of funds that he paid to his builder was RRC, that he and Gretchen currently live in the Kingman house, and that the purchase price of the land also came from RRC.  Les Dep., 12:2–13:1.  He also stated that he bought the 92 acres as several parcels: he bought the 20-acre parcel of property on which his home now sits in January 2014, and that he paid $115,000.00 for it and two additional parcels (totaling 32 acres); he bought an additional 40-acre parcel for $78,000.00; and two additional parcels together for $45,000.00 (totaling 20 acres).  Id. at 6:8–8:13.  The Howells cannot manufacture a dispute within the material they gave to the Receiver to create a material dispute of fact at summary judgment.

2008.  Second, that instead of a legitimate investment opportunity, the Silver Pool operated as a classic Ponzi scheme.  Third, that Gretchen and Leslie Howell were investors in the Silver Pool. Fourth, that the Howells received $3,218,103.96 as distributions from the Silver Pool in excess of the amounts they contributed to the Silver Pool.  Mot. Summ. J. 1–2.  The Receiver seeks to have this amount returned to the Receivership Estate as a voidable transfer pursuant to Utah's Uniform Voidable Transactions Act (the UVTA).  For the reasons discussed below, the court grants the Receiver's Motion for Summary Judgment in its entirety.

       i.   <u>Summary Judgment Standard.</u>

"A party is entitled to summary judgment if 'there is no genuine dispute as to any material fact.'"  <u>Arlin Geophysical Co. v. United States</u>, 946 F.3d 1234, 1237 (10th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).  "A fact is material if, under the governing law, it could affect the outcome of the lawsuit."  <u>Id.</u> (quoting <u>Cillo v. City of Greenwood Vill.</u>, 739 F.3d 451, 461 (10th Cir. 2013)).  "A factual dispute is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  <u>Id.</u> (quoting <u>Cillo</u>, 739 F.3d at 461).  In applying this standard, courts "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."  <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998).

      ii.   <u>Rules Regarding Voidable Transfers Under the UVTA.</u>

A transfer is voidable under the UVTA "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."  Utah Code Ann. § 25-6-202(1)(a). The UVTA allows a creditor to obtain "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."  <u>Id.</u> § 25-6-303(1)(a); <u>see also id.</u> § 25-6-304(2)(a) ("[T]o the extent a transfer is avoidable in an action by a creditor under Subsection 25-6-303(1)(a), . . . the creditor may recover judgment for the value of the asset transferred.").  "In the

context of a Ponzi scheme . . . 'the mere existence of a Ponzi scheme is sufficient to establish a

defendant's actual intent to defraud.'"  Hafen v. Brimley, No. 2:19-CV-00875, 2021 WL

1424713, at *4 (D. Utah Apr. 15, 2021) (quoting Klein v. Nelson, No. 13-cv-497, 2015 WL

4545748, at *2 (D. Utah July 28, 2015)); see also Wing v. Dockstader, 482 F. App'x 361, 363

(10th Cir. 2012) (unpublished).[16]  "[A] receiver of an entity which was used to perpetrate a Ponzi

scheme has standing to recover fraudulent transfers as though the receiver were a creditor of the

scheme."  Brimley, 2021 WL 1424713, at *4 (quoting Dockstader, 482 F. App'x at 363).

   Once a Receiver "establishes that the debtor operated as a Ponzi scheme, all transfers by

the debtor entity are presumptively fraudulent and are subject to avoidance."  Id. at *5.  "The

recipient of funds from the Ponzi scheme then bears the burden of demonstrating that (1) the

funds were received in good faith and (2) in exchange for reasonably equivalent value."  Id.

(citing Klein v. King & King & Jones, P.C., No. 2:12-CV-00051, 2013 WL 4498831, at *2 (D.

Utah Aug. 19, 2013)).  "[A]n investor in a Ponzi scheme does not exchange reasonably

equivalent value for payments which exceed the investor's investments."  Miller v. Wulf, 84 F.

Supp. 3d 1266, 1274 (D. Utah 2015); see also Donell v. Kowell, 533 F.3d 762, 777–78 (9th Cir.

2008) (holding that up to the amount "profit" payments return an investor's initial outlay, there is

an exchange of "reasonably equivalent value," but amounts above this are merely used to keep

the fraud going by giving the false impression that the scheme is a profitable, legitimate business

and are not a "reasonably equivalent" exchange for the defrauded investor's initial outlay).  If the

Receiver can establish that the Silver Pool operated as a Ponzi scheme, that will mean that

"amounts received by investors in excess of their principal investment—i.e., an investor's

---

[16] Unpublished decisions are cited for persuasive value.  Fed. R. App. 32.1; DUCivR 7-2(a)(2).

'profits' from the scheme—[were] not received in exchange for reasonably equivalent value and must be returned to the Receivership Estate."  Brimley, 2021 WL 1424713, at *5.

iii.  Since at Least 2008, the Receivership Defendants Operated a Silver Investment Scheme (the Silver Pool).

The Howells admit that Les began investing in Rust Rare Coin beginning in October 2008.  Opp. Mot. Summ. J. 3, 11.  They point to a "dispute" in terminology, saying that Gretchen did not understand her investment to be in "the Silver Pool."  Opp. Mot. Summ. J. 11 (characterizing Gretchen's investment).  But this debate about nomenclature is not a material dispute of fact.  Rather, the Howells admit that Gretchen knew she was investing in silver through her investments in RRC.  Id. at 3.  They also contest the admissibility of the Receiver's experts' reports and declarations, see id. at 6, but as discussed above, the court will consider the Receiver's experts' materials at summary judgment and the Howells' contestation of admissibility does not mean these facts are genuinely disputed for the purposes of summary judgment.  Rather, these materials undisputedly establish the existence of the Silver Pool and that the Receivership Defendants ran and promoted it.  See Hafen Report 12–13; Strong Decl. ¶¶ 20, 98.  As there is no material dispute of fact as to this issue, the court determines that Gaylen Dean Rust operated a Silver Investment Scheme (the Silver Pool) since at least 2008.

iv.  The Silver Pool Operated As A Classic Ponzi Scheme, Instead of a Legitimate Investment Opportunity.

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."  In re M & L Bus. Mach. Co., Inc., 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (quoting Sender v. Heggland Family Trust (In re Hedged-Invs. Assocs., Inc.), 48 F.3d 470, 471 n. 2 (10th Cir. 1995)).  To "show that an investment scheme falls within the definition

17

of a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the sine qua non of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors." S.E.C. v. Mgmt. Sols., Inc., No. 2:11-cv-1165, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013). It is also important "that the Receiver shows that returns to investors could not be paid by the underlying business venture," id., by definition, Ponzi schemes are insolvent from their start, Klein v. Cornelius, 786 F.3d 1310, 1320 (10th Cir. 2015).

> Other factors, though non-essential to the definition of a Ponzi scheme, have been used by courts to decide if an investment scheme fits into the Ponzi definition. These include the promise of large returns; the promise of returns with little to no risk; the promise of consistent returns; the delivery of promised returns to earlier investors to attract new investors; the general insolvency of the investment scheme from the beginning; the secrecy, exclusivity, and/or complexity of the investment scheme; and the general stability of the investment scheme, among other factors.

Mgmt. Sols., Inc., at *19.

This court has declined to make a blanket finding that the RRC Silver Pool was a Ponzi scheme, but it has found that it was a Ponzi scheme in three ancillary cases. See Enforcement Action, ECF No. 470 (declining to make blanket Ponzi finding and listing cases where RRC was found to be a Ponzi scheme). Here, as in past RRC ancillary cases, the undisputed material facts from the Hafen Report prove the sine qua non of a Ponzi scheme: the Receivership Defendants diverted investor funds to other RRC-affiliated businesses and to pay returns to existing investors. The undisputed material facts show that there is no evidence of purchases or sales of silver in volumes necessary to sustain the Silver Pool and, similarly, no evidence that Receivership Defendants ever stored the quantities of silver that were represented to investors. See, e.g., Hafen Report 16. The undisputed facts cited from Mr. Strong's analyses also support the determination that the Silver Pool was a Ponzi scheme. These facts show that payments made to investors could only have been from funds received from other investors and that there

was no other source of funds from which these investor payments could have been made.  See,
e.g., Strong Report 76–77.

　　　　To be sure, some of the information in these expert reports is hearsay—the interviews
and claims forms referenced in the Hafen Report, for example, do not appear to fit within any of
the Federal Rules of Evidence's hearsay exceptions[17]—and would not be admissible at trial.  But
as is discussed above, at summary judgment, the court considers such "statements only insofar as
they support or otherwise explain the reasoning and ultimate conclusions of the expert."  Navajo
Nation Hum. Rts. Comm'n, 281 F. Supp. 3d at 1161–62 (citing Daubert, 509 U.S. at 592).
Doing so, the undisputed facts establish that the Silver Pool was a Ponzi scheme.

---

[17] For example, the business records exception to the hearsay rule "provides that
certain records of regularly conducted business activity are admissible for their truth even though
they contain hearsay."  Id. at 1065 (citing Fed. R. Evid. 803(6)). To satisfy this exception,

　　　　a record "must (1) have been prepared in the normal course of business; (2) have
　　　　been made at or near the time of the events recorded; (3) be based on the personal
　　　　knowledge of the entrant or of a person who had a business duty to transmit the
　　　　information to the entrant; and (4) indicate the sources, methods and circumstances
　　　　by which the record was made were trustworthy."

Id. (quoting United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)).  The records the Receiver
obtained from the Receivership Defendants fit within this exception and are, consequently,
admissible at trial and the court can consider them at summary judgment.  But according to the
Receiver, the statements contained in the "claims forms" came from the hundreds of such forms
that the Receiver mailed to, and received back from, "investors" defrauded by the Receivership
Defendants.  Opp. Mot. Exclude Hafen 5; Hafen Report ¶ 24 ("The Receiver . . . established a
claims procedure whereby investors and other creditors were required to submit official claim
forms containing pertinent information and documentation supporting their monetary claims
against the receivership estate.").  A reply to a "claims form" from a Receiver is (1) not a record
prepared in the normal course of business, and (2) unlikely to have been made at or near the time
of the events recorded but rather, likely made looking back at events.  See id. at 1065.  As a
result, while some of the documentation sent to the Receiver via the "claims forms" information
gathering process would be admissible via the business records exception to the hearsay rule, this
exception does not appear to cover all the information in the claims forms.  This constrains how
the court can use this information at summary judgment.

That the Silver Pool was a Ponzi scheme is <u>confirmed</u> by the statements and admissions made by Mr. Rust; Mr. Rust's comments are not essential to this finding.  <u>See</u> Hafen Report 16 (observing Mr. Rust's admissions "are consistent with [Mr. Hafen's] review of the books and records of Receivership Defendants.").  When Mr. Rust's opinions are contained in the expert reports and declarations, the court can take them into account as it does other hearsay statements. <u>See</u> <u>Navajo Nation Hum. Rts. Comm'n</u>, 281 F. Supp. 3d at 1161–62 (citing <u>Daubert</u>, 509 U.S. at 592).  But even without the information from Mr. Rust's statements—either as they are included in the Receiver's experts reports and declarations, or as they were made in his Fed. R. Crim. P. 11(c)(1)(C) plea[18]—the undisputed facts from other sources provide enough support for the Ponzi scheme determination.

This is not the first time the court has addressed whether the Silver Pool operated as a Ponzi scheme.  It has held in other lawsuits ancillary to the Enforcement Action that the Silver Pool operated as a Ponzi Scheme beginning in at least 2008.  <u>See</u> <u>Hafen v. Famulary</u>, No. 19-CV-00627, 2021 WL 229356, at *4–5 (D. Utah Jan. 22, 2021); <u>Brimley</u>, 2021 WL 1424713, at *5; <u>Hafen v. Evans</u>, No. 2:19-cv-00895, 2021 WL 3501658 (D. Utah Aug. 9, 2021).  Here, as with the Defendants in <u>Famulary</u>, <u>Brimley</u>, and <u>Evans</u>, the Howells do not show that there is any

---

[18] The contents of Mr. Rust's statement in advance of his guilty plea were brought before the court as an exhibit to the Receiver's Reply in Support of its Motion for Summary Judgment.  <u>See</u> ECF No. 55 at 2 (attaching copy of Mr. Rust's Statement in Advance of Plea of Guilty and Plea Agreement Pursuant to Fed. R. Crim. P. 11(c)(1)(C) in <u>United States v. Rust</u>, Case No. 2:19-cr-00164, ECF No. 134, as Exhibit A to the Receiver's Reply in this case, and noting Mr. Rust stated "I used investment money from later investors to pay the promised returns to earlier investors.  In this way, I created the false impression that the silver trading program was profitable.").  The court can make the requested determination without relying on Mr. Rust's statement in advance of his guilty plea.  Consequently, the court does not consider Mr. Rust's statement in advance of his guilty plea for the purposes of this Order, and the court does not decide the question of Mr. Rust's statement's admissibility.

material dispute of fact about this issue.  The court holds that, instead of a legitimate investment

opportunity, the Silver Pool operated as a classic Ponzi scheme.

> v.   Both Les and Gretchen Howell Were Investors in the Silver Pool.

In assessing the Howells' Silver Pool investments, the court analyzes Les and Gretchen's

dealings with RRC separately because although "they both contributed to household expenses,

they maintained separate bank accounts and kept their finances largely separate."  Opp. Mot.

Summ. J. 3;  Reply Supp. Mot. Summ. J. 8, ECF No. 55 (discussing Mot. Summ. J. ¶¶ 22–23)

("acknowledge[ing] that the Howells each made separate investments.").  There are no genuine

disputes of material fact that Les and Gretchen Howell were investors in the Silver Pool, or about

the amounts that they each invested.  As a result, the court declares that both Les and Gretchen

Howell were investors in the Silver Pool.

> 1.  There is No Material Dispute of Fact that Gretchen Invested
> $96,450.00 in the Silver Pool.

Gretchen says she made investments with her own cash, and gave value, to RRC, in the

amount of $96,450.00.  Opp. Mot. Summ. J. 11.  There is no material dispute about this amount.

Mot. Summ. J. ¶ 22.  The court determines that Gretchen Invested $96,450.00 in the Silver Pool.

> 2.  There is No Material Dispute of Fact that Les Invested $1,222,003.77
> in the Silver Pool.

Les states that he made investments of $1,222,003.77 into the Silver Pool.  Opp. Mot.

Summ. J. 12.  In his Motion for Summary Judgment, the Receiver says Les' investment into the

Silver Pool was $1,218,446.04.  Mot. Summ. J. ¶ 23.   In reply, the Receiver notes the figure

cited by Les is at odds with Les' interrogatory responses, Reply Supp. Mot. Summ. J. 8, where

the Howells cite to documents representing the total to be $1,218,446.04, Def. Interrog. Resps.

7–8.  Regardless, there is no dispute about this amount; Les made at least as much of an

investment into RRC as the Receiver states.  The small difference between figures does not preclude summary judgment because for the purposes of the Motion for Summary Judgment the Receiver accepts the Howells' numbers and seeks judgment in the amount the Howells concede Les received in excess: $1,222,003.77.

The court determines that Gretchen and Les Howell were investors in the Silver Pool; there is no material dispute that Gretchen invested $96,450.00 and Les invested $1,222,003.77.

> vi.  Les Howell and Gretchen Howell are Liable for the Distributions from the Silver Pool they Received in Excess of their Contributions.

The Receiver asks the court to determine "that the Howells received $3,218,103.96 as distributions from the Silver Pool in excess of the amounts they contributed to the Silver Pool." Mot. Summ. J. 2.  He argues that Les and Gretchen are liable for this amount under the UVTA. The Receiver also argues that if the court finds Gretchen is not liable under the UVTA, it should hold that she must relinquish title to the Kingman home under the doctrine of unjust enrichment.

Because Les and Gretchen invested in the Silver Pool separately, in deciding whether this determination is appropriate, the court again analyzes Les and Gretchen's finances separately, as it did when analyzing their Silver Pool investments.  Doing so, the court finds that Les and Gretchen are liable for the distributions that they received in excess of their contributions.

> 1.  There is No Material Dispute About the Fact that Les Received $3,218,103.96 from RRC in Excess of his "Investment" and that this Amount was not Exchanged for Reasonably Equivalent Value.

As discussed above, the parties agree that Les invested at least $1,222,003.77 in the Silver Pool.  Les argues he is additionally owed statutory interest.  He is incorrect.  Les has identified no legal basis for which he is entitled to interest, although he repeatedly cites an inapplicable status in support of this argument.  See Opp. Mot. Summ. J. 26–27 (citing Utah

Code Ann. § 15-1-1).[19]  The court, similarly, finds no legal basis to award Les interest on his

"investment," indeed, the court has already barred claims for interest against the Receivership

Estate.  See Enforcement Action, ECF No. 375.  The court finds that Les' claim to interest does

not create a material dispute of fact concerning the amount Les received from RRC as compared

to what he was entitled to as a net winner in the RRC Ponzi scheme.

Les states that he received payments in the form of checks, wires and one metal

transaction (gold) from RRC totaling $4,522,830.85.  Opp. Mot. Summ. J. 13 (admitting this fact

in objecting and responding to ¶ 26 of the Receiver's Motion for Summary Judgment).  Relying

on the Howells' responses to the Receiver's interrogatories, the Receiver points out that the total

of the payments disclosed by that spreadsheet is $4,511,000.00.  Def. Interrog. Resps. 10, 26–28

(representing Les received disbursements totaling $4,511,000.00).  Consequently, there is no

dispute that Les received disbursements totaling at least $4,511,000.00.

There is no material dispute that Les received millions in excess of his principal

investment, specifically $3,218,103.96 more than he invested.  As the Receiver has shown that

the Silver Pool operated as a Ponzi scheme, this amount, which is what Les received in excess if

his principal investment, was not received in exchange for reasonably equivalent value and must

be returned to the Receivership estate.[20]

---

[19] Les relies on the current version of Utah Code Ann. § 15-1-1.  The current version is not
retroactive.  W. Sur. Co. v. Com. Coatings Corp., No. 1:20-cv-00004, 2021 WL 662393, at *3
(D. Utah Feb. 19, 2021).  The version of section 15-1-1 that was effective during the Howells'
"investment" period said that "the legal rate of interest for the loan or forbearance of any money,
goods, or chose in action shall be 10% annum."  See id.  Les does not explain how his Silver
Pool investment fits this statutory text.

[20] In addition to showing that they received reasonably equivalent value, to retain their
investment, the Howells each must show they acted in good faith.  Ponzi scheme net winners
who do not take in good faith are liable for the entire "investment" rather than just net winnings.
See Kowell, 533 F.3d at 777.  However, the entire "investment" is not at issue here because the

2. <u>There Are No Material Disputes About Whether Gretchen Exchanged the Funds and Benefits She Received from the Silver Pool, Either Directly or as a Transferee, for Reasonably Equivalent Value.</u>

Gretchen "paid $74,450.00 more to the Receivership Defendants than she received from them." Opp. Mot. Summ. J. 12 (admitting this fact). The $22,000.00 payment that she took from the Receivership Defendants in exchange for her individual investments in the Silver Pool falls below her initial outlay. The $22,000.00 payment was consequently exchanged for reasonably equivalent value. There is also a material dispute of fact whether she took these funds in good faith—had Gretchen known RRC was a Ponzi scheme, it is unlikely she would have left her investments with them to lose her $74,450.00.

The Receiver's motion for summary judgment is denied regarding the funds that Gretchen directly received from her individual investments in RRC; put differently, it is denied insofar as the $22,000 that Gretchen took from the Receivership Defendants in return for her individual investments in the Silver Pool.

Gretchen's interest in the Kingman home and property requires a different analysis. While Gretchen may not have directly paid for the Kingman land or house construction out of her individual RRC investments, Utah law permits recovery against those who are immediate or mediate transferees. <u>See</u> Utah Code Ann. § 25-6-304(2)(b) ("Except as otherwise provided in this section, to the extent a transfer is avoidable in an action by a creditor under Subsection 25-6-303(1)(a), the following rules apply . . . the judgment may be entered against . . . an immediate or mediate transferee of the first transferee, other than: a good faith transferee that took for value; or an immediate or mediate good faith transferee of a person [who is a good faith transferee that

Receiver conceded for the purposes of the motion that it does not seek a judgment for the $1,218,446.04 Les invested. <u>See</u> Reply Supp. Mot. Summ. J. 20.

24

took for value]."). The Receiver contends Gretchen is such a transferee because she was transferred her interest in the Kingman home and property by Les, who bought that home and property with the disbursements he received from the Receivership Defendants. The Receiver further argues that Gretchen must disgorge the joint title to the Kingman property because the Kingman property was not exchanged for reasonably equivalent value.

The Howells counter that Gretchen cannot be held liable under the UVTA for transfers RRC made to Les. They say that because payments from RRC to Les were deposited in Les' bank account, and he decided how to spend the contents of his account, Gretchen is not the transferee of funds RRC distributed to Les. Opp. Mot. Summ. J. 24. But Les chose to use his disbursements from RRC to buy the land and build the home in Kingman, and then to title it in Gretchen's name as well as his own. See Les Dep., 7:2–20; see also Gretchen Dep. 4:23–25. To the extent Gretchen holds title in property bought with disbursements from RRC that were in excess of the amount Les invested in the Silver Pool, she is a transferee. Judgment may be entered against her unless she is "(A) a good faith transferee that took for value; or (B) an immediate or mediate good faith transferee of [a good faith transferee that took for value]." Utah Code Ann. § 25-6-304(2)(b).

"At [the summary judgment] stage, a reviewing court must examine the factual record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party, but it may grant summary judgment when the record taken as a whole couldn't lead a rational trier of fact to find for the non-moving party." Klein v. Shepard, No. 2:19-CV-00533, 2022 WL 2441311, at *19 (D. Utah July 5, 2022) (quoting Sidlo v. Millercoors, LLC, 718 Fed. App'x 718, 726 (10th Cir. 2018)). "A court's proper role thus involves determining whether a jury could reasonably find that the plaintiff proved his case by the quality and quantity of the evidence." Id.

(quoting <u>Sidlo</u>, 718 Fed. App'x at 726).  On the record before the court, Gretchen cannot show that reasonably equivalent value was given in exchange for the value she received in the form of ownership of the Kingman land and the home built on it.  As discussed above, there is no material dispute whether Les gave reasonably equivalent value in return for the excess funds he received from the Receivership Defendants.  It is undisputed that he did not.  Similarly, there are no disputes as to whether Gretchen took her portion of the Kingman land and home for reasonably equivalent value.  Rather, the record shows that she accepted it as a gratuitous spousal gift.  As a result, Gretchen cannot show either that she is a good faith transferee that took for value or an immediate or mediate good faith transferee of such a person, and the court grants the Receiver summary judgment as to Gretchen's interest in the Kingman property.  The excess funds received by Les, that he used to pay for the Kingman land[21] and house, and that he transferred to Gretchen by titling the property in her name as well as his own, were not exchanged for reasonably equivalent value.  This excess must be disgorged.[22]

## V.    Order

For the reasons discussed above, the court **ORDERS** the following:  The court DENIES the Howells' Motion to Exclude Proposed Expert Jonathan Hafen (ECF No. 52).  The court also

---

[21] The Howells note that Les purchased the real property on which his and Gretchen's home is constructed with some of the earliest distributions Les received from RRC, and that the distributions directly traceable to the purchase of the property on which the home is constructed were in satisfaction of an antecedent debt that RRC owed Les, and exchanged for reasonably equivalent value.  Opp. Mot. Summ. J. 15–16 (¶ 10 of statement of additional facts).  These assertions do not change the court's analysis because, first, the Howells' assertions here incorrectly assume their investments in RRC were loans, and second, ultimately the amount that must be disgorged is what was received as disbursements in excess of the amounts "invested" in RRC.

[22] The court does not reach the issue as to whether Gretchen must relinquish the home under the doctrine of unjust enrichment, having already decided she must relinquish it under the UVTA. <u>See</u> <u>Johnson v. Blendtec, Inc.</u>, 500 F. Supp. 3d 1271, 1291 (D. Utah) (observing that the doctrine of unjust enrichment is "meant to provide a remedy where one is unavailable at law.").

DENIES the Howells' Motion to Exclude Proposed Expert D. Ray Strong (ECF No. 54).

However, the court notes that its holdings as to the admission of the Hafen Report and the Strong

Report are limited to the summary judgment context.  The court GRANTS the Receiver's

Motion for Summary Judgment as to all four declarations sought by the Receiver (ECF No. 37).

DATED this 23rd day of February, 2023.

BY THE COURT:

TENA CAMPBELL
United States District Judge